**Robert Kyle MORRIS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 03–98–00528–CR.**

Court of Appeals of Texas, Austin.

Aug. 31, 1999.

Art Keinarth, Reynolds & Keinarth, Smithville, for appellant.

Charles D. Penick, Criminal Dist. Atty., Forrest L. Sanderson, Asst. Criminal Dist. Atty., Bastrop, for State.

Before Justices JONES, B.A. SMITH and DALLY.*

CARL E.F. DALLY, Justice (Retired).

Appellant Robert Kyle Morris was convicted in a jury trial of the offense of aggravated assault with a deadly weapon. *See* Tex. Penal Code Ann. § 22.02(a)(2) (West 1994). The trial court assessed appellant's punishment at imprisonment for 16 years.

Appellant asserts that the trial court erred in unreasonably limiting jury voir dire, in denying appellant's challenge of a venireman for cause, and in admitting inadmissible evidence at the punishment phase of trial. We will sustain appellant's first point of error. The judgment will be

---

* Before Carl E.F. Dally, Judge (retired), Court of Criminal Appeals, sitting by assignment.

*See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).

reversed and the cause remanded to the trial court.

Although appellant does not contest the sufficiency of the evidence, a statement of some of the facts is necessary to an understanding of the discussion of appellant's point of error. The 19–year–old appellant was an avowed devil worshipper. He believed that most people were devil worshippers. He felt that God was not all-powerful and needed the help of Lucifer, the devil. Appellant and the young woman victim became friends when they worked at a fast food restaurant. The victim testified that they were not romantically involved; but together, they had attended a concert in Austin and two movies. When they attended the concert in Austin, appellant, a frequent cross-dresser, wore a wig and woman's clothing. The victim was not shocked, she testified, because to her generation it was not shocking to see cross-dressers in Austin.

On September 24, 1997, the victim was employed by an automobile dealer as a file clerk. That evening when she was leaving work and planning to attend church, she found a note from appellant in her car seat. As she finished reading the note, appellant drove up and parked near her car. He asked her to go with him and she got into his car. While he drove, he told her that he was very tired and cold and that he had not slept for days because a spirit had entered his body and was haunting him. After driving several miles, appellant drove into a cemetery telling the victim that the only person who could get the spirit out of him was a high priestess who lived in the cemetery. The victim testified that she "kind of believed him because [she did] believe that people can be possessed." Appellant parked his car and they started to walk toward a house in back of the cemetery. They were in a secluded area and out of sight from those who might be on the road. They walked to a fence in back of the house. While she was looking at the house and thinking about what might happen, appellant came

up behind her, put his arms around her, and thanked her for coming with him. Appellant asked her to close her eyes and turn around. The victim then felt a very sharp pain in her back. She thought appellant had "punched her really hard." She turned around and saw appellant holding a knife. Appellant said the knife always looked better with fake blood on it. She put her hand behind her and when she drew it back it was covered with blood. She asked appellant why he was doing this. He told her that he wanted to kill her so that he could become a witch. Appellant told the victim that she was not a good Christian. They started to walk towards the road, and the victim told appellant that it was not her time to die. Appellant said that she would be getting weak soon because she was losing a lot of blood and that she might as well give up. Then in the words of the victim's testimony:

And after I kept telling him that it wasn't my time to go because I didn't know if I was going to go to heaven or hell, he told me that he was raised in a Baptist home and the only thing that he knew to do was to get down on my knees and start praying to the Lord and asking for forgiveness and really meaning it.

And I thought that was the end of it, and I didn't care, you know, what I had to do. So I got down on my knees in front of this guy who had a knife and was trying to kill me, you know. I got down on my knees and started praying to the Lord to forgive me for all my sins, you know, and admit me into heaven or whatever if he killed me.

And he actually—Kyle threw down his knife behind him, and he's sitting there basically preaching to me when I was on my knees. And I just—I didn't feel comfortable. I didn't feel any sort of resolve or anything as I was praying, so I got back up, and he was just in his—it wasn't my time to go, it was not my time to go. And he was telling me that it was

my time to go and where did I want it next.

And at one point he came up to me and he took my arms and he spread them to my side and he said, "Hold your wings up high," and he took a step back away from me. And when he stepped back away from me, I put my arms down because I wasn't going to stand there with my arms up and let this guy, you know, come at me with a knife again.

And after that happened, I can remember standing, and I was facing the cemetery road and his back was to it. And I saw a car go up the cemetery road back, like, away from the Farm Road 969 back farther to the cemetery, and I think that he saw it also. And I kind of ran around him trying to get away, and when I did, he grabbed me. And at some point there was a little struggle, and he got his hand away from my breast and he·slit my throat. And I think that after he slit my throat I fell down on my back and—.

Well, I was trying to get away at this point because I saw a car on the road. And after he slit my throat, I think I fell down on my back, and he was standing over me with a knife. And my first reaction was to kick up, and I kicked him with, I believe, my left foot. And I guess I kicked him so hard that my shoe fell off. And as soon as I kicked him, I flew back up and was on my feet, and I started running. And I saw a truck driving down the cemetery road now, and the truck was going away from the cemetery back onto Farm Road 969.

And as I started running, I didn't get very far and Kyle came up behind me. And he turned me around and my back was against his chest and I had a hold of his arm with the knife in his hand. And with his other hand he was shoving his fingers down my throat while I was screaming trying to keep me from screaming.

And somehow I got away from him. And when I got away from him, I just started running again towards the road and this truck. And I said, "Stop," and the man was out looking at Kyle's car. And while I was running I kind of turned around and I saw Kyle throw his knife down and start, you know, kind of running after me.

And we got up to this man who was in his truck and I was just, you know, telling him to take me to the hospital.

During the trial, several witnesses testified, including law enforcement officers and a DNA expert. Appellant offered extensive testimony of a psychiatrist and a psychologist. The State offered the testimony of a psychologist. These experts agreed appellant was mentally ill and dangerous, but disagreed on whether he was legally insane.

 In his first point of error, appellant urges that the trial court erroneously limited defense counsel's jury voir dire examination to 45 minutes. In *Ratliff v. State,* 690 S.W.2d 597 (Tex.Crim.App. 1985), the court found reversible error because the trial court arbitrarily limited voir dire to one hour even though the trial court extended that time for 21 minutes. *See id.* at 599. The *Ratliff* court quoted *Mathis v. State,* 576 S.W.2d 835, 836 (Tex. Crim.App.1979), as follows:

The right to be represented by counsel, guaranteed by Article 1, Section 10 of the Texas Constitution, encompasses the right of counsel to question the members of the jury panel in order to intelligently exercise his peremptory challenges. *Mathis v. State,* 167 Tex.Cr.R. 627, 322 S.W.2d 629 (1959); *De La Rosa v. State,* 414 S.W.2d 668 (Tex.Cr.App. 1967); *Burkett v. State,* 516 S.W.2d 147 (Tex.Cr.App.1974); *Hernandez v. State,* 508 S.W.2d 853 (Tex.Cr.App.1974); *Abron v. State,* 523 S.W.2d 405 (Tex.Cr. App.1975). The trial court, in its sound discretion, can and should control the voir dire examination of the venire; ...

*Ratliff,* 690 S.W.2d at 599–600. The standard for appellate review in determining whether a trial court has abused its discretion in limiting jury voir dire may be gleaned from *Ratliff.*

Under *Ratliff,* the appellate court must conduct a three prong test to consider whether the trial judge abused his discretion by imposing a time limitation on voir dire. The reviewing court must determine:

1. whether the party attempted to prolong the voir dire,

2. whether the questions that the party was not permitted to ask were proper voir dire questions, and,

3. whether the party was not permitted to examine prospective jurors who actually served on the jury.

*Ratliff,* 690 S.W.2d at 599–600.

*McCarter v. State,* 837 S.W.2d 117, 119 (Tex.Crim.App.1992); *see also Tobar v. State,* 850 S.W.2d 182 (Tex.Crim.App. 1993). "[T]he right of counsel to question venire members and the right of the trial court to control the voir dire and impose reasonable restrictions coexist and must be harmonized." *Ratliff,* 690 S.W.2d at 599. "Each case must be examined on its own facts. A reasonable time limitation for one case may not be reasonable for another." *Id.* at 600. The amount of time allotted is not, by itself, conclusive. Various and unpredictable considerations such as the complexity of the case or the makeup of the venire may prolong voir dire examination. Challenges for cause and discussions at the bench can contribute to a lengthy voir dire examination. *See id.* at 600.

Immediately after the State started its voir dire examination, the trial court said to the prosecutor: "Mr. Haymes, one thing I didn't discuss with counsel or announce to counsel is that I would like each side to limit their voir dire to no more than 45 minutes." The record does not reflect the exact time used by the State in voir dire, but presumably it was completed within the 45–minute limitation. During defense counsel's voir dire, the trial court told defense counsel that he had only five minutes left. After that time elapsed, defense counsel asked for more time to question individual panel members who had indicated they were "having a problem with either expert testimony or the insanity defense" and also "police officer testimony." Out of the presence of the panel, counsel named for the court the panel members he wanted to question individually because of the problems he had stated to the court. Counsel continued:

And I think those are the questions, Judge, that we would ask the prospective jurors if we were given additional time for voir dire. It would help us delve into whether or not any of the jurors could be struck for cause or challenged for cause and/or would assist us in being effective in representation of our client by giving us additional information from which we can make our peremptory challenges.

THE COURT: What is the State's posture with reference to that?

MR. HAYMES: Your Honor, it appears to the State that when Mr. Parks
. . .

THE COURT: I hate to interrupt you, but basically my question is, do you agree with the defense's request in any respect?

MR. HAYMES: No, I do not. I think he's had enough time.

THE COURT: Okay. And I'll deny your request based upon the reasons that I previously stated, which are that you made an election as to what matters you would pursue in using your voir dire time, and that's a trial tactic and decision you made but the Court has no control over it, and I'm not trying to control it. So your request is denied.

The record shows that panel members Mamie King, Billy Lamson, and Donna Graham served as jurors. When the panel was being examined, Mamie King indicated she might not trust expert witnesses who were paid a fee. If he had not

been prevented by the court imposed time limit, defense counsel told the court he would ask King why she would distrust expert witnesses, whether or not she could set aside her opinion and give appellant a fair trial, and whether she would be prejudiced against appellant for relying on expert witnesses in this case. "A statement of a potential juror that he has a problem with the law does not alone provide insight into whether that potential juror can set aside personal feelings and follow the law." *McCarter*, 837 S.W.2d at 121.

When the panel was questioned, Billy Lamson and Donna Graham said that they knew Officer Earl Pence. Officer Pence had been introduced to the panel as a witness. During the trial, Pence gave substantial, significant testimony. Defense counsel told the court that if not prevented by the court's voir dire time limit he would inquire of Lamson and Graham of their relationship to Pence and whether or not their relationship with Officer Pence would affect their duty as jurors. In addition, the record shows defense counsel claimed to have used nine of the defense's peremptory strikes against panel members that counsel was not allowed to question individually about specified matters raised while the panel was being questioned. We conclude that defense counsel was not allowed to ask proper voir dire questions of three panel members who served on the jury. Therefore, appellant met the second and third *Ratliff* requirements. *See also Smith v. State*, 703 S.W.2d 641, 643–45 (Tex.Crim.App.1985); *Clark v. State*, 608 S.W.2d 667, 668–70 (Tex.Crim.App.1980).

Relative to the first *Ratliff* requirement, appellant argues that defense counsel made effective and efficient use of the limited time the court allotted for voir dire by inquiring into relevant and accepted areas. However, the State charges defense counsel did not properly manage his time during voir dire and appeared to deliberately waste time on inappropriate matters in an attempt to create an appel-

late issue. The State in its brief further argues:

A careful examination of the record demonstrates that Appellant's trial counsel never had an intent to manage his time within the pre-established 45–minute limitations. Perhaps the best evidence of this is trial counsel's investment of nearly 20 percent of his time (six of his 37 pages of the voir dire record) speaking to the panel about private religious matters, including professing his own personal belief in Jesus, the Bible, and the actual existence of demons. Not only was this theological diatribe extremely inappropriate in a judicial setting, it also demonstrates counsel's complete disregard for the trial court's previously mandated time limits. Furthermore at the end of his allotted time, counsel did not make a reasonable request for a little more time, but rather asked for another 45 minutes, no doubt counting on the trial court being unwilling to grant this inane plea for double the amount of time given to the State.

The record is clear that the trial court was not amused at trial counsel's time management during voir dire, as shown by the following exchange which occurred at the end of trial counsel's time:

Mr. Parks: Judge, may we approach the bench? We've run into some difficulty. We have several who have announced that they are having a problem with either expert testimony or the insanity defense. But there was one other issue that was going to create problems, police officer testimony, that we feel compelled to ask for more time, additional time to question the jurors individually.

The Court: Counsel, I told you when you got started that you had 45 minutes to decide, and how you've chosen to use that is something that I can't control. But I can see that what you're asking for is at least another hour and a half, and I think that's an unreasonable use of your time and the

Court's time and the jury's time, so I'm going to deny your request.

Trial counsel's behavior, along with his carefully scripted bill of exception, clearly shows how the entire jury selection process was for defense a cleverly orchestrated event, calculated not so much for eliciting a timely and relevant dialogue with the jury panel, but more so for the purpose manipulating the record in an attempt to create reversible error.

To decide whether the first *Ratliff* requirement was met, we have reviewed the entire record to determine whether defense counsel unreasonably and inappropriately prolonged jury voir dire. The State is very critical of defense counsel's use of as much as six pages of its 37–page voir dire in a "theological diatribe" contending that this demonstrated defense counsel's "disregard for the trial court's previously mandated time limits." The State has failed to point out any other specific instance which in its view defense counsel "never had any intent to manage his time within the pre-established 45–minute limitations."

During voir dire, defense counsel explained a defendant's right not to testify and explored the reasons why an inarticulate defendant might for that or other reasons not testify. Counsel then asked the panel members if they could think of reasons why a defendant might not testify and asked for examples of defendants who had not testified. A panel member mentioned a New York case in which a defendant who had taken hostages did not testify. Another panel member mentioned "O. J.," and another panel member mentioned Jesus Christ. There was then a discussion of Jesus being tempted and offered a pact by the devil; defense counsel then asked the panel members whether they believed that scriptural account. A considerable amount of the psychiatrist's and psychologists' testimony *related to* appellant's strict religious upbringing, his satanic beliefs, and his possession by demons.

A review of the State's voir dire shows that the prosecutor's discussion and questions concerning religion and religious beliefs also required six pages of the record. The prosecutor discussed his Christian mother's belief in prayer. He discussed the beliefs of Baptists, Catholics, and Hindus. He discussed belief in angels, and belief in and the worship of the devil. The prosecutor seemed to be making a legitimate point that although people had different religious beliefs they were not necessarily insane and that those who worshipped the devil are not necessarily for that reason legally insane.

It would appear that appellant's insanity defense involving devil worship and his professed demonic possession would justify the defense counsel's voir dire that is criticized by the State. Defense counsel's voir dire, in the context of this case, was not unreasonable or inappropriate and was not an attempt to unjustifiably prolong the voir dire. The length of a trial, its uniqueness, and its complexity may not be entirely foreseeable, but these possibilities are matters for consideration in *setting* and *maintaining* arbitrary time limits for jury voir dire. Here, there were harbingers indicating a risk in setting and maintaining arbitrary jury voir dire time limits. In view of the circumstances revealed by the entire record, we hold that all of the requirements of *Ratliff* were met, and it has been shown that the limitation on voir dire in this case constituted an abuse of discretion. Appellant's first point of error is sustained.

It is most unlikely that in the event of another trial the matters presented in appellant's remaining points of error would reoccur; therefore, we will not discuss those matters.

The judgment of the trial court is reversed, and the cause is remanded to the trial court.